In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 18-1531

NICOLE D. NELSON,

*Plaintiff-Appellant,*

*v.*

GREAT LAKES EDUCATIONAL LOAN
SERVICES, INC., et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:17-CV-183 — **Nancy J. Rosenstengel**, *Chief Judge.*

---

ARGUED OCTOBER 23, 2018 — DECIDED JUNE 27, 2019

---

Before KANNE, HAMILTON, and ST. EVE, *Circuit Judges.*

HAMILTON, *Circuit Judge*. Like many students, plaintiff Nicole Nelson borrowed money to pay for her education. Defendant Great Lakes Educational Loan Services, Inc. services repayment of her federally insured loans. On its website, Great Lakes offered to provide guidance to borrowers struggling to make their loan payments. It told borrowers: "Our trained experts work on your behalf," and "You don't have to

pay for student loan services or advice," because "Our expert representatives have access to your latest student loan information and understand all of your options." Nelson alleges that despite these representations, when she and other members of the putative class struggled to make payments, Great Lakes did not work on their behalf. Instead, Nelson contends, Great Lakes steered borrowers into repayment plans that were to Great Lakes' advantage and to borrowers' detriment.

Nelson alleges that defendant's conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act and constituted constructive fraud and negligent misrepresentation under Illinois common law. The district court granted Great Lakes' motion to dismiss, holding that all of Nelson's claims were expressly preempted by this provision of the federal Higher Education Act: "Loans made, insured, or guaranteed pursuant to a program authorized by title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.) shall not be subject to any disclosure requirements of any State Law." 20 U.S.C. § 1098g. The district court reasoned that Nelson's claims are expressly preempted because they all allege in substance only that Great Lakes failed to disclose certain information.

The district court's ruling was overly broad. When a loan servicer holds itself out to a borrower as having experts who work for her, tells her that she does not need to look elsewhere for advice, and tells her that its experts know what options are in her best interest, those statements, when untrue, cannot be treated by courts as mere failures to disclose information. Those are affirmative misrepresentations, not failures to disclose. Great Lakes chose to make them. A borrower who reasonably relied on them to her detriment is not barred by

§ 1098g from bringing state-law consumer protection and tort claims against the loan servicer. Tort law has long recognized the difference between mere failures to disclose information and affirmative deceptions. And as we explain below, the Ninth Circuit decision the district court relied upon, *Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010), does not apply to claims of affirmative misrepresentations in counseling borrowers in distress.

Accordingly, Nelson's claims are not expressly preempted to the extent she is alleging that Great Lakes made false or misleading affirmative representations to her in the counseling process. Also, neither conflict preemption nor field preemption applies to her claims. We vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

I.  *Factual & Procedural Background*

The district court granted defendant's Rule 12(b)(6) motion to dismiss on preemption grounds, a legal determination that we review *de novo*. *Guilbeau v. Pfizer Inc.*, 880 F.3d 304, 310 (7th Cir. 2018), citing *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 907–08 (7th Cir. 2005). We accept as true all well-pleaded factual allegations in the amended complaint and draw all permissible inferences in Nelson's favor. E.g., *Fortres Grand Corp. v. Warner Bros. Entertainment Inc.*, 763 F.3d 696, 700 (7th Cir. 2014).

A.  *Loans Under the Higher Education Act*

The Higher Education Act ("HEA") was enacted "to keep the college door open to all students of ability, regardless of socioeconomic background." *Rowe v. Educational Credit Management Corp.*, 559 F.3d 1028, 1030 (9th Cir. 2009) (citation and

internal quotation marks omitted); see also 20 U.S.C. § 1071(a)(1) (identifying purposes of statute). The HEA established the Federal Family Education Loan Program ("FFELP"), a system of loan guarantees administered by the U.S. Secretary of Education that were "meant to encourage lenders to loan money to students and their parents on favorable terms." *Chae v. SLM Corp.*, 593 F.3d at 938–39 (footnote omitted).

The FFELP regulated three parts of student loan transactions: (1) between lenders and borrowers, (2) between borrowers and guaranty agencies, and (3) between guaranty agencies and the Department of Education. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 640 (7th Cir. 2015), citing *Chae*, 593 F.3d at 939. Under the program, lenders used their own funds to make loans to students attending postsecondary institutions. These loans were guaranteed by guaranty agencies and reinsured by the federal government. See 20 U.S.C. § 1078(a)–(c). Thus, the federal government served (and still serves) as the ultimate guarantor on FFELP loans. *Bible*, 799 F.3d at 640. Lenders assigned the loans to loan servicers like Great Lakes to manage the repayment process with the borrowers.

In 2010, Congress ordered a halt in new FFELP loans and transitioned to a "Direct Loan" program, in which the United States serves as the lender and contracts with non-governmental entities to service loans issued by the Department. 20 U.S.C. § 1071(d); see also Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2201 et seq., 124 Stat. 1029, 1074. Federal Direct Loans "have the same terms, conditions, and benefits" as those issued under the FFELP. 20 U.S.C. § 1087e(a)(1).

Central to the preemption issue here, the HEA requires lenders and loan servicers to make certain "disclosures" before disbursement of loans, before repayment of loans, and during repayment of loans. See 20 U.S.C. § 1083. Required disclosures include the core terms of the loan at origination, as well as before and during repayment. § 1083(a), (b), & (e). But when a borrower is having difficulty making payments, as Nelson was, § 1083(e)(2)(A) requires loan servicers to provide: "A description of the repayment plans available to the borrower, including how the borrower should request a change in repayment plan." Loan servicers must also provide to distressed borrowers descriptions of forbearance and other options to avoid default and expected costs or fees associated with those options. § 1083(e)(2)(B) & (2)(C).

The HEA includes several express preemption provisions, including the one dealing with "disclosures," which is the focus of this appeal. Entitled "Exemption from State disclosure requirements," again it provides: "Loans made, insured, or guaranteed pursuant to a program authorized by title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.) shall not be subject to any disclosure requirements of any State law." 20 U.S.C. § 1098g. Both Federal Direct Loan Program and FFELP loans are so authorized, so lenders and loan servicers are not subject to "disclosure requirements" imposed by state law.

B. *Nelson's Loans and Claims*

Nicole Nelson financed her education with federal student loans. Great Lakes, Nelson's loan servicer, manages borrowers' accounts, processes payments, assists borrowers with alternative repayment plans, and communicates with borrowers about the repayment of their loans. Great Lakes services

many billions of dollars in federal student loans for millions of borrowers.

Nelson began repaying her loans in December 2009. In September 2013, she changed jobs and her income dropped. She contacted Great Lakes, and its representative led Nelson to believe that "forbearance" was the best option for her personal financial situation. A few months later, Nelson lost her new job. She contacted Great Lakes again in March 2014. Great Lakes' representative again did not inform her of income-driven repayment plans and instead steered her into "deferment." Nelson alleges that Great Lakes' representatives were working off of a script provided to them by Great Lakes when they made these recommendations to her. Nelson alleges that she relied on the information provided by Great Lakes.

Forbearance is "the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously were scheduled." 34 C.F.R. § 682.211(a)(1). Nelson argues that forbearance is not appropriate for borrowers experiencing long-term financial difficulty. Under forbearance, unpaid interest is capitalized (i.e., added to the loan principal), which can substantially increase monthly payments after the forbearance period ends.

Federal law requires lenders and loan servicers to offer income-driven repayment plans, which set monthly loan payments as a percentage of a borrower's discretionary income. See 20 U.S.C. § 1098e(b); 34 C.F.R. §§ 682.215 & 685.208. Nelson argues that these plans are more appropriate in situations of longer-term financial hardship. These plans can offer borrowers extended payment relief and

reduced monthly payments that can still count toward various loan forgiveness programs. Despite the availability of these plans, Nelson alleges, Great Lakes steered borrowers away from income-driven repayment plans that are less lucrative to lenders and toward more burdensome options, especially forbearance. Am. Cplt. ¶ 6. Nelson asserts that enrolling borrowers in income-driven repayment plans is "time-consuming" and requires "lengthy and detailed conversations" with the borrowers about their financial situations. She argues that Great Lakes thus "failed to perform its core duties in the servicing of student loans."

To help focus on the factor we view as decisive here—the difference between affirmative misrepresentation and failure to disclose information—we lay out next some of the details of Nelson's allegations.

Count I of Nelson's Amended Complaint asserts violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 et seq. She highlights seven unfair acts and practices in servicing loans:

> (a) Holding themselves out to be experts in student loan servicing issues or offering "expert" help;

> (b) Holding themselves out as working on Plaintiff's and Class Members' behalves, when they worked for the benefit of Defendants;

> (c) Holding themselves out as understanding all student loan options, and offering those options to student loan borrowers, including Plaintiff and Class Members;

(d) Offering forbearance as a recommended or best option to struggling student loan borrowers who could have enrolled in a much better repayment plan;

(e) Failing to provide struggling student loan borrowers all of their options, or discussing income driven repayment plans prior to enrolling student loan borrowers in forbearance;

(f) Failing to follow up with student loan borrowers after a first forbearance and explaining or alerting student loan borrowers to other, more advantageous repayment options; and

(g) Systematically steering struggling student loan borrowers, including Plaintiff and Class Members into forbearance without explaining, or even identifying other, better repayment options, based in part of Defendants' failure to adequately staff its operations, *providing scripts that call center employees had to follow, reviewing call center employees on call duration and how many times a student loan borrower was cut off mid-sentence,* or by providing other incentives for quick call times.

Am. Cplt. ¶ 130 (emphasis in original). These allegations combine both affirmative misrepresentations by Great Lakes, such as recommending forbearance as the best option for a particular borrower, and failures to disclose information.

Count II alleges constructive fraud under Illinois common law, saying in part:

> 154. Defendants accomplish this breach of a confidential or fiduciary relationship by misrepresenting, concealing, or omitting the detrimental effects of entering or continuing in forbearance, omitting other alternative repayment options, including income driven repayment options that would allow $0.00 monthly payments holding themselves out as "experts," holding themselves out as having all student loan borrowers information, and holding themselves out as working in the best interest of student loan borrowers, including Plaintiff and the Illinois Constructive Fraud Class Members.
>
> … .
>
> 158. Defendants held themselves out to all student loan borrowers as "experts," held themselves out as knowledgeable regarding student loan borrowers situations, and held themselves out as working on behalf and to the benefit of student loan borrowers.

Am. Cplt. ¶¶ 154 & 158. These allegations also combine affirmative misrepresentations and failures to disclose.

Count III alleges negligent misrepresentation under Illinois common law. Nelson asserts that, to increase its profits, Great Lakes "supplied false information or omitted material information for the guidance of student loan borrowers." Am. Cplt. ¶ 170. Great Lakes is alleged to have accomplished this by "misrepresenting their 'expert' status, misrepresenting

that they work for the benefit of student loan borrowers, and misrepresenting or omitting material information, including alternative or income driven student loan repayment options which may have offered a $0.00 monthly repayment amount." Am. Cplt. ¶ 171. Nelson includes a list that alleges both misrepresentations and omissions of information similar to her list in Count I:

(a) Defendants claim to be "experts" regarding student loan;

(b) Defendants work for the benefit of student loan borrowers;

(c) Forbearance or deferment are the only options for struggling student loan borrowers; and

(d) Failure to discuss or counsel student loan borrowers on alternative and income driven repayment plans.

(e) Offering forbearance as a recommended or best option to struggling student loan borrowers who could have enrolled in a much better repayment plan;

(f) Failing to provide struggling student loan borrowers all of their options, or discussing income driven repayment plans prior to enrolling student loan borrowers in forbearance;

(g) Systematically steering struggling student loan borrowers, including Plaintiff and Class Members into forbearance without explaining, or even identifying other, better repayment options, based in part of Defendants' failure to

> adequately staff its operations or by providing
> other incentives for quick call times.

Am. Cplt. ¶ 172.[1]

The district court agreed with Great Lakes that all of Nelson's allegations pertain to information Great Lakes supposedly failed to disclose. The court dismissed all of Nelson's claims, holding that they are expressly preempted by 20 U.S.C. § 1098g. *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, No. 3:17-CV-183, 2017 WL 6501919, at *5–6 (S.D. Ill. Dec. 19, 2017). The court did not determine whether Nelson's claims were preempted under the conflict- or field-preemption

---

[1] Nelson's allegations echo the findings of an Inspector General's report on loan servicers' compliance with federal law generally and advice about repayment options in particular. See U.S. Department of Education Office of Inspector General, ED-OIG/A05Q0008, Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans (Feb. 12, 2019), available at: https://www2.ed.gov/about/offices/list/oig/audit-reports/fy2019/a05q0008.pdf. According to the report, the Department's "oversight activities regularly identified instances of servicers' not servicing federally held student loans in accordance with Federal requirements," yet the Department "rarely used available contract accountability provisions to hold servicers accountable for instances of noncompliance" and "did not provide servicers with an incentive to take actions to mitigate the risk of continued servicer noncompliance that could harm students." *Id.* at 2. The Inspector General found that these failures can result in "increased interest or repayment costs incurred by borrowers, the missed opportunity for more borrowers to take advantage of certain repayment programs, negative effects on borrowers' credit ratings, and an increased likelihood of delinquency or even default." *Id.* at 19. Particularly relevant to this case is a section entitled "Servicer Representatives Not Sufficiently Informing Borrowers of Available Repayment Options." *Id.* at 10–13.

doctrines or whether, in the absence of preemption, Nelson otherwise stated viable claims.

II. *Analysis*

The Supremacy Clause of the United States Constitution "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 712–13 (1985), quoting *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824). The Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. "Since state law may not contradict federal law, sometimes the latter will render the former unenforceable." *Int'l Ass'n of Machinists Dist. Ten v. Allen*, 904 F.3d 490, 509 (7th Cir. 2018).

Preemption can occur in three different ways: express, conflict, and field. Express preemption applies when Congress clearly declares its intention to preempt state law. *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010). Conflict preemption applies when there is an actual conflict between state and federal law such that it is impossible for a person to obey both, or when state law stands as an obstacle to fully accomplishing the objectives of Congress. *Mason*, 596 F.3d at 390; see also *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013). Field preemption, which applies to

only a few fields of law, occurs when "federal law so thoroughly occupies a legislative field as to make it reasonable to infer that Congress left no room for the states to act." *Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008) (citation and internal quotation marks omitted). We first explain why some of Nelson's claims are not expressly preempted. We then explain why those claims are not preempted by either conflict or field preemption.

A. *Express Preemption*

1. *Statutory Language*

Express preemption presents a question of statutory interpretation, so we start with the preemptive language: "Loans made, insured, or guaranteed pursuant to a program authorized by title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.) shall not be subject to any disclosure requirements of any State Law." 20 U.S.C. § 1098g. The intent to preempt some state laws is evident, but Congress did not define the term "disclosure requirements" in the HEA itself. The central question here is whether and how the phrase "disclosure requirements" in § 1098g applies to state-law remedies for misleading business practices. Section § 1098g preempts a state law declaring, for example, that student loan servicers must affirmatively disclose X and Y in a specific format and at a specific time. But Congress did not use language that preempts all state-law consumer protections for student loan borrowers when they are communicating with their loan servicers.

While § 1098g indicates that Congress "intended the [HEA] to pre-empt at least some state law, we must nonetheless 'identify the domain expressly pre-empted' by that

language." See *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996), quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992). As the Supreme Court often reminds us, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019), quoting *Davis v. Michigan Dep't of Treasury*, 489 U. S. 803, 809 (1989). The statutory context and scheme here provide helpful guidance for the question we face here.

In general, disclosure requirements are familiar regulatory tools applied to consumer borrowing and other financial transactions. Rather than regulating the substance of the transaction terms (such as usury laws do by limiting interest rates), disclosure requirements are intended to ensure that consumer-borrowers have accurate, relevant information and can make their own informed choices about their financial affairs. Such disclosure requirements are familiar under many regulatory regimes, including, for example, the Truth in Lending Act and federal securities regulation, including FINRA rules for broker-dealers. See, e.g., 15 U.S.C. § 1601 et seq.; 17 C.F.R. § 240.15c2-5; FINRA Rule 2264 (2011).

The language of § 1098g itself provides no specific guidance about the scope of "disclosure requirements." Other HEA provisions, however, impose explicit disclosure requirements on lenders and loan servicers, particularly in 20 U.S.C. § 1083. It makes sense to understand "disclosure requirements" in § 1098g against the backdrop of those federal disclosure requirements in § 1083. The HEA also includes, in addition to § 1098g, several other fairly specific preemption provisions: 20 U.S.C. § 1078(d) (usury laws), § 1091a(a)(2)

(statutes of limitations), § 1091a(b) (collection costs/infancy defenses), and § 1095a(a) (garnishment requirements). These other provisions in the HEA help guide our interpretation of § 1098g.

First, the several specific preemption provisions in the HEA weigh against attributing to Congress a desire to preempt state law broadly. The specific preemption provisions show that Congress considered the issue of preemption and decided to preempt on particular topics. It most certainly did not enact language imposing broad preemption on any state laws, or even any state consumer-protection or tort laws, that might apply to student loans and their servicing.

At the same time, the express disclosure requirements in the HEA lead us to disagree with Nelson's argument that "disclosure requirements"—and the associated preemption intended by Congress—pertain solely to "standardized, pre-scribed provision of the terms and conditions and facts of a student lending transaction," and not to counseling borrow-ers in financial difficulty. In particular, 20 U.S.C. § 1083 spells out disclosures that are required before disbursement of loans, before repayment of loans, *and during repayment of loans*. Under the subsection entitled "Required disclosures during repayment," a paragraph entitled "Information provided to a borrower having difficulty making payments" provides:

> Each eligible lender shall provide to a borrower who has notified the lender that the borrower is having difficulty making payments on a loan made, insured, or guaranteed under this part with the following information in simple and understandable terms:

(A) A description of the repayment plans available to the borrower, including how the borrower should request a change in repayment plan.

(B) A description of the requirements for obtaining forbearance on a loan, including expected costs associated with forbearance.

(C) A description of the options available to the borrower to avoid defaulting on the loan, and any relevant fees or costs associated with such options.

20 U.S.C. § 1083(e)(2).

In the context of these express disclosure requirements in § 1083, the phrase "disclosure requirements" in § 1098g applies to information that must be given to borrowers who are struggling to repay their loans. Listed as a "required disclosure" to borrowers struggling during repayment is a "description of the repayment plans available to the borrower, including how the borrower should request a change in repayment plan." § 1083(e)(2)(A). This sort of communication between a lender and a borrower is exactly what is at issue in the present case. Nelson alleges that when she informed Great Lakes that she was struggling with repayment, it did not appropriately inform her of her repayment plan options. We therefore disagree with Nelson's effort to distinguish between disclosures on standardized origination and billing forms and communications with struggling borrowers about their repayment options.

That being said, we agree with Nelson that the HEA's preemption of state-law "disclosure requirements" does not bar entirely her attempt to use Illinois consumer-protection and tort law. Nelson complains of false and misleading statements that Great Lakes made voluntarily, not required by federal law. Imposing liability for those voluntary but deceptive statements does not impose additional "disclosure requirements" on Great Lakes.

Many of Nelson's specific claims allege that Great Lakes misled her and other class members by making affirmative misrepresentations—about its expertise and its devotion to borrowers' best interests, and in recommending forbearance as the best option for borrowers in financial trouble. The district court found these claims were preempted by recasting them as omissions, such that state law would implicitly impose on Great Lakes some disclosure requirements in addition to those imposed by federal law. *Nelson*, 2017 WL 6501919, at *5.

We respectfully disagree with that reasoning. At least some of Nelson's claims of affirmative deception do not necessarily imply any additional disclosure requirements at all. She is complaining about at least some deceptive statements that Great Lakes chose to make voluntarily, not because federal law required them. Great Lakes could have avoided these claims by remaining silent. State law could impose liability on these affirmative misrepresentations without imposing additional disclosure requirements on Great Lakes, and thus avoid preemption under § 1098g. See *Altria Group, Inc. v. Good*, 555 U.S. 70, 79–82 (2008) (state-law fraud claims for false affirmative representations in cigarette advertising were not preempted by federal law).

One foundation of the law of fraud and negligent misrepresentation is the difference between an affirmative misrepresentation and a failure to disclose. The common law tort of fraud ordinarily requires a deliberately false statement of material fact. E.g., *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 881–82 (7th Cir. 2005); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996); *Siegel v. Levy Organization Development Co.*, 607 N.E.2d 194, 198 (Ill. 1992). An omission or failure to disclose, on the other hand, will not support a common law fraud claim but may be actionable as constructive fraud or fraudulent concealment if the defendant was under a particular duty to speak, which may stem from a fiduciary duty or a similar relationship of trust and confidence. See *Joyce v. Morgan Stanley & Co.*, 538 F.3d 797, 800 (7th Cir. 2008) (Illinois law); *Connick*, 675 N.E.2d at 593; Restatement (Second) of Torts § 551 (1977).

When a plaintiff alleges a defendant's actionable failure to disclose, it is easy to understand how that claim implies a "disclosure requirement," to use the language of § 1098g. But when a plaintiff alleges a defendant's false affirmative misrepresentation, recasting the claim as imposing a "disclosure requirement" is not necessary and may not even be appropriate. If the claim is that the defendant said something false that it was not required to say in the first place, the claim does not necessarily imply a disclosure requirement. The defendant could have complied with its legal obligations, under the plaintiff's theory, by merely refraining from making the false affirmative misrepresentation about its expertise, its work in borrowers' best interests, and its recommendation of forbearance to most distressed borrowers.

In this case, the district court relied upon a broad reading of the Ninth Circuit's opinion in *Chae v. SLM Corp.*, 593 F.3d

936 (9th Cir. 2010), to treat Nelson's complaints about affirmative misrepresentations as implying some additional disclosure requirements. While *Chae* may apply to some of Nelson's claims, it was a mistake to read *Chae* so broadly. The plaintiffs in *Chae* complained about the supposed failures to disclose key information in specific ways, such as loan terms and repayment requirements. Since the defendant was required to disclose that information by federal law and had disclosed it in ways permitted by federal law, the Ninth Circuit found that the plaintiffs were implicitly seeking to impose additional disclosure requirements under state law. We do not disagree with the Ninth Circuit's reasoning, but *Chae* itself made clear that § 1098g would not extend to other sorts of disclosures to borrowers. *Chae* limited the reach of some of its broader language by holding that other state-law claims, focusing on the "use of fraudulent and deceptive practices *apart from the billing statements*," are *not* preempted by § 1098g. 593 F.3d at 943 (emphasis added).

That limitation applies to this case, or at least to parts of it. The broad language in *Chae* simply does not extend to Nelson's claims about Great Lakes' affirmative misrepresentations in counseling, where Great Lakes could have avoided liability under state law by remaining silent (or telling the truth) on certain topics. On this theory, plaintiff may proceed on her claims based on affirmative misrepresentations, as distinct from those that require proof that defendant failed to disclose information.

We recognize that it would be possible to apply state consumer protection laws to impose additional disclosure requirements on loan servicers of federally insured student loans. Such applications would be preempted under § 1098g,

as the Ninth Circuit made clear in *Chae*. 593 F.3d at 942–43. But that result is not necessary or inherent in Nelson's claims, at least to the extent she alleges affirmative misrepresentations. We cannot say on the pleadings that all of Nelson's claims are preempted by § 1098g. On remand, the district court may need to use jury instructions and other tools to allow Nelson to proceed on her claims of affirmative misrepresentations while ensuring that the case does not become a vehicle for state law to impose new disclosure requirements.

B.  *Conflict and Field Preemption*

Great Lakes has argued in the alternative for conflict and field preemption. The district court did not reach those issues, but we should. They present questions of law that we can address at the pleading stage. To show conflict preemption, Great Lakes must show either that it would be "impossible" for Great Lakes to comply with both state and federal law or that state law (as Nelson seeks to apply it) constitutes an "obstacle" to satisfying the purposes and objectives of Congress. See *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013). Great Lakes does not identify any impossible conflict, but it argues that application of state law here would be an obstacle to the operation of federal student loan programs.

Conflict preemption does not bar Nelson's claims. Recall that there are several express preemption provisions in the HEA: 20 U.S.C. § 1078(d) (usury laws), 1091a(a)(2) (statutes of limitations), 1091a(b)(collections costs and infancy defenses), 1095a(a) (garnishment requirements), as well as § 1098g (disclosure requirements). The number of those provisions and their specificity show that Congress considered preemption issues and made its decisions. Courts should enforce those provisions, but we should not add to them on the theory that

more sweeping preemption seems like a better policy. E.g., *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (plurality opinion) ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law ...."). Properly understood, state law and federal law can exist in harmony here.[2]

The Ninth Circuit in *Chae* used broad language on conflict preemption and the value of uniformity in the federal loan program: "Congress intended uniformity within the [FFELP]. The statutory design, its detailed provisions for the FFELP's operation, and its focus on the relationship between borrowers and lenders persuade us that Congress intended to subject FFELP participants to uniform federal law and regulations." 593 F.3d at 947. That broad language, however, focused on different sorts of claims, where the value of uniformity would be more compelling than it is here. *Chae* focused on uniformity in the method of setting late fees, repayment start

---

[2] We do not give special deference to the U.S. Department of Education's 2018 informal guidance, entitled "Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers." 83 Fed. Reg. 10619 (Mar. 12, 2018). The Department expressed its view that the HEA preempts all state regulations that "impact" FFELP loan servicing. We agree with the district court's thorough analysis of this issue in *Student Loan Servicing Alliance v. District of Columbia*, 351 F. Supp. 3d 26, 48–49 (D.D.C. 2018), that *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), provides the appropriate test for deference here. We also agree that the Preemption Notice is not persuasive because it is not particularly thorough and it "represents a stark, unexplained change" in the Department's position. *Student Loan Servicing Alliance*, 351 F. Supp. 3d at 50; see *Skidmore*, 323 U.S. at 138. That is not to say we disagree with every particular in the Department's informal guidance, but we give the document itself little weight.

dates, and interest calculations. See *id*. at 944–47. We assume the need for nationwide consistency on those sorts of administrative mechanics is substantial. That need does not extend to the claims Nelson asserts based on affirmative misrepresentations—not required by federal law—to borrowers having trouble making their payments.[3]

Finally, field preemption does not apply here. Field preemption is rare. It applies "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no

---

[3] The Department's Preemption Notice also cited *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), to argue that the servicing of student loans "is an area 'involving uniquely Federal interests' that must be 'governed exclusively by Federal law.'" See 83 Fed. Reg at 10619, citing *Boyle*, 487 U.S. at 504. The Department explained that "there is no question that the 'imposition of liability on Government contractors will directly affect the terms of Government contracts,' at the very least by raising the price of such contracts, and 'the interests of the United States will be directly affected.'" *Id.* at 10621, quoting *Boyle*, 487 U.S. at 507. It is true that the federal government has an interest in protecting the rights and obligations established in its contracts, and that this interest extends to "liability to third persons." *Boyle*, 487 U.S. at 505. At the same time, Illinois has a compelling interest in protecting its consumers by providing oversight of federal student loan servicers. See *Student Loan Servicing Alliance*, 351 F. Supp. 3d at 59. *Boyle* itself noted that just because an area involves a "uniquely federal interest," that "does not, however, end the inquiry. That merely establishes a necessary, not a sufficient, condition for the displacement of state law. Displacement will occur only where ... a significant conflict exists between an identifiable federal policy or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation." 487 U.S. at 507 (internal citations, quotation marks, and footnote omitted). While *Boyle* explained that the conflict in such a situation "need not be as sharp" as it generally would to find preemption, "conflict there must be." *Id.* at 507–08. We see no such conflict posed by Nelson's claims here, at least to the extent those claims are confined to affirmative misrepresentations.

room for supplementary state legislation.'" *Int'l Ass'n of Machinists Dist. Ten v. Allen*, 904 F.3d 490, 498 (7th Cir. 2018), quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986). "Federal statutes that preempt a field 'reflect[ ] a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.'" *Int'l Ass'n of Machinists*, 904 F.3d at 498, quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1481 (2018).

On this point we agree with *Chae*. See 593 F.3d at 941–42 ("we have previously held that field preemption does not apply to the HEA"), citing *Keams v. Tempe Technical Inst., Inc.*, 39 F.3d 222, 225–26 (9th Cir. 1994) (holding that field preemption did not apply under HEA to preempt state tort claim by students against accrediting agency: "It is apparent … that Congress expected state law to operate in much of the field in which it was legislating."); accord, *Armstrong v. Accrediting Council for Continuing Educ. and Training, Inc.*, 168 F.3d 1362, 1369 (D.C. Cir. 1999) (affirming prior holding that "federal education policy regarding [private lending to students] is not so extensive as to occupy the field"). In the HEA, Congress chose to displace state law only in certain specified, express preemption provisions. Those provisions indicate that Congress has not sought to displace *all* state regulation of student loans. And the absence of language indicating an intent to occupy the field weighs heavily, of course, "in favor of holding that it was the intent of Congress *not* to occupy the field." *Frank Bros. v. Wisconsin Dep't of Transp.*, 409 F.3d 880, 891 (7th Cir. 2005), citing *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 718 (1985).

Field preemption is confined to only a few areas of the law, such as the National Labor Relations Act, *Int'l Ass'n of*

*Machinists*, 904 F.3d at 497–98, and the Employee Retirement Income Security Act, *Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 776–79 (7th Cir. 2002). Courts consistently apply field preemption in cases dealing with those federal statutes. The opposite is true here. Courts have consistently held that field preemption does not apply to the HEA, and we do as well.

## *Conclusion*

Nelson has alleged claims under state law that are not necessarily preempted by federal law. The judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.